IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,   No. 3:16-cr-00352-HZ-02

          Plaintiff,   OPINION & ORDER

   v.

LAWRENCE COLLINS,

          Defendant.

Leslie Goemaat
Stephen K. Moulton
United States Department of Justice
Tax Division
Western Criminal Enforcement Section
601 D Street N.W.
Washington, DC 20004

1 – OPINION & ORDER

Quinn P. Harrington
United States Attorney's Office
District of Oregon
1000 SW Third Avenue, Suite 600
Portland, OR 97204

 Attorneys for Plaintiff

Matthew G. McHenry
Levine & McHenry LLC
1050 SW Sixth Avenue, Suite 1414
Portland, OR 97204

 Attorneys for Defendant

HERNÁNDEZ, District Judge:

The question of Defendant Lawrence Collins's competency to stand trial is before the Court. The Court has considered the evidence and argument from the parties and, for the reasons explained in this opinion, finds that Defendant Collins is competent to stand trial.

## BACKGROUND

The Government charged Defendant with two counts of Conspiracy to Defraud the Government with Respect to Claims and one count of Theft of Government Funds in 2016. The indictment alleges that Defendant participated in a tax fraud scheme by providing a co-conspirator with personal identifying information and bank account information of individuals, which the co-conspirator used to file fraudulent personal federal income tax returns for the purpose of receiving fraudulent income tax refunds. Indictment ¶ 8, ECF 1. The government alleges that Defendant then directed the funds to be deposited onto stored-value debit cards and into bank accounts he controlled and then withdrew funds from the debit cards and accounts at ATM machines. *Id*. at ¶¶ 10-11. The indictment does not allege that Defendant prepared the fraudulent tax returns. Since his indictment, Defendant has undergone several competency evaluations.

## I. Competency Evaluations

### A. Past Evaluations

In 2017, the parties asked the Court to determine Defendant's mental competency to stand trial. Unopposed Mtn. for Comp. Hrg., ECF 123. Alexander Millkey, Psy.D., evaluated Defendant for that purpose in August 2017. Fitness to Proceed Eval., Aug. 4, 2017 ("Millkey Aug. 2017 Report") 1, ECF 133. Dr. Millkey opined that Defendant was able to aid and assist in his defense, noting that he had previously been through a trial for menacing and had accepted a plea bargain in another case filed against him for driving under the influence of intoxicants. *Id*. at 12-13. The Court held a competency hearing on August 30, 2017, and found that Defendant was capable of understanding the nature of the proceedings against him and able to aid and assist in his defense. Minutes of Proceedings, ECF 132.

Defendant's counsel raised the issue of Defendant's competency again in August 2018 after a state court found him incompetent in another case. Def. Mtn. Re Further Comp. Proceedings, Baggio Decl. 3, ECF 198. At the parties' request, Dr. Millkey re-evaluated Defendant in September 2018, and the Court held a second competency hearing on October 2, 2018. Dr. Millkey testified that although Defendant could understand the nature of the proceedings against him, he was unable to aid and assist in his defense due to the complexity of the charges against him. Dr. Millkey testified, however, that it was likely that Defendant's competency could be restored. Tr. Oct. 2, 2018, Hrg. 74:3-12, 74:14-16, 76:24-77:3. Dr. Millkey explained:

> Mr. Collins had a full-scale IQ of 67, which is in the higher range of mild intellectual disability. And often, but not always, people with intellectual functioning in that range are restored to fitness ultimately . . . . [I]f someone were to describe a case to me and say, 'This person has a full-scale IQ of 67,' my impression, based on that information, would be that this person is likely to be

> restorable eventually. Not everybody with intellectual functioning in that range is ultimately restored, but that's the range where it commonly occurs.

*Id*. at 73:23-74:2. The Government conceded that Defendant was unable to aid and assist in his defense at that time. Gov. Mem. On Complexity of Case 2, ECF 215. The Court found Defendant mentally incompetent to stand trial and ordered the Attorney General to take custody of Defendant for competency restoration treatment at Federal Medical Center ("FMC") Butner. Order, ECF 250.

### A. Current Evaluations

Defendant received an initial period of competency evaluation and restoration treatment at FMC Butner from March 27, 2019, until July 24, 2019. Wood Forensic Eval. Jul. 24, 2019 ("Wood Jul. 2019 Report") 1, ECF 305. Allyson Wood, Psy.D., a forensic psychologist who oversaw Defendant's competency restoration treatment at FMC Butner, reviewed the two prior competency evaluations of Defendant by Dr. Millkey, the three competency evaluations completed in relation to Defendant's state court proceedings, and Defendant's medical, court, and education records. *Id*. at 2. Dr. Wood agreed with previous evaluators that Defendant has a mild intellectual disability and noted that "[a]n intellectual disability is typically a condition which remains stable over time." *Id*. at 4. Dr. Wood also diagnosed Defendant with malingering and alcohol use disorder. *Id*. She initially placed Defendant in a weekly competency restoration group. When Defendant struggled with the pace of the group due to his intellectual disability, in July 2019, she placed him in the Slater Method Intensive Competency Group, which is designed for people with intellectual disabilities. *Id*. at 5-6. After Defendant had received four months of competency restoration treatment, Dr. Wood advised that his prognosis for restoration remained good and recommended that Defendant remain committed in FMC Butner to continue with

competency restoration in the Slater Method group, which he had just begun, and work on his issues with poor effort. *Id*. at 8.

The Court committed Defendant for an additional four-month period of competency restoration treatment, which concluded on November 21, 2019. Order, ECF 309. At that time, Dr. Wood found that Defendant was no longer malingering, was able to understand the nature and consequences of the proceedings against him, and was able to assist in his defense. Wood Forensic Report Nov. 22, 2019 ("Wood Nov. 2019 Report") 5, ECF 333. Defendant was released from FMC Butner on November 21, 2019, and Dr. Wood certified that his competency to stand trial had been restored. Order for Release 1, ECF 330; Certificate, ECF 334.

Dr. Millkey re-evaluated Defendant on January 20, 2020, and found that he was unable to understand the nature and consequences of the proceedings against him and assist properly in his defense. Millkey Jan. 20, 2020, Fitness to Proceed Eval. ("Millkey Jan. 2020 Report") 22-23, ECF 340. As a result, Dr. Millkey opined that Defendant was not competent to stand trial. *Id*.

## II. Competency Hearing

The Court held a second competency hearing on February 20, 2020, and received evidence that included the testimony of Drs. Wood and Millkey, their reports, Dr. Millkey's resume, and Dr. Wood's notes from the Evaluation of Competency to Stand Trial—Revised, a psychological test she administered to Defendant.

### A. Dr. Wood's Report and Testimony

Dr. Wood testified that during the first four months of Defendant's treatment at FMC Butner he showed signs of malingering. Tr. Feb. 20, 2020, Hearing ("Hrg. Tr.") 9:9-15. She observed that during her sessions with Defendant at the beginning of his commitment at FMC Butner, he spoke with a stutter, had slow speech, and had difficulty remembering their

conversations the next day. Hrg. Tr. 9:23-10:15. Dr. Wood reviewed transcripts of Defendant's telephone calls and listened to some of his phone calls during his commitment and noted that Defendant did not have those difficulties when he talked to his family and friends. Hrg. Tr. 10:9-13. During his phone calls, Defendant sometimes spoke in code out of fear that his calls were being monitored, and he demonstrated a higher level of verbal fluency and comprehension during phone calls than he did when he spoke with Dr. Wood. Wood Jul. 2019 Report 4. He also correctly used legal terminology like "warrant," "trial," and "discovery" during his phone calls. *Id*. at 8. Defendant also told Dr. Wood that he struggled with reading and was not able to grasp written material, but later he told Dr. Wood that he had been reading the bible and reading materials in the law library. Hrg. Tr. 10:22-11:2. Defendant's scores on the psychological tests that Dr. Wood administered suggested that Defendant was not putting forth full effort and that he had feigned deficits in his legal knowledge. Wood Jul. 2019 Report 4-5. Dr. Wood diagnosed Defendant with malingering because he intentionally demonstrated false and exaggerated symptoms and because his knowledge and comprehension of the legal system was not as impaired as he displayed. *Id*. at 5, 8.

After Defendant demonstrated challenges with comprehension during the weekly competency restoration group at FMC Butner, Dr. Wood placed Defendant in the Slater Method competency restoration group. Hrg. Tr. 13:2-12. The Slater Method group met three times weekly and repeated each of five sequences a minimum of three times before progressing to the next module. Hrg. Tr. 14:8-17. The first sequence included the topics of charges and pleas and the consequences of being found guilty; the second sequence covered courtroom personnel; and the third sequence included trial proceedings and plea bargains. *Id*. at 14:18-22. Defendant

completed the three sequences and participated in role playing exercises and hypothetical scenarios to solidify his understanding of the concepts. *Id*. at 14:22-15:2.

Dr. Wood testified that after July 2019, when the Court ordered Defendant to remain in the custody of the Attorney General for further competency treatment, Defendant's effort and performance in competency restoration classes significantly improved. Hrg. Tr. 11:19-12:4. Dr. Wood believed that Defendant made stronger, genuine effort during the additional four-month period of hospitalization, and she attributed his improved performance to his eagerness to be reunited with his family. *Id*. at 15:25-16:3. Defendant took notes, carried them around with him, and had his roommate quiz him on the concepts he had learned in competency restoration classes. *Id*. at 16:4-7. She testified that Defendant did not demonstrate signs of malingering during his second four-month term of hospitalization and removed her previous diagnosis of malingering. *Id*. at 22:21-24.

Between July and November 2019, Defendant attended the Slater Method group two to three times weekly and attended the mainstream competency group once weekly. Over the course of the eight months he spent at FMC Butner, Defendant attended twenty-six basic competency restoration group sessions and twelve Slater Method group sessions for a total of thirty-eight competency restoration group sessions. *Id*. at 15:9-14. Dr. Wood administered the Evaluation of Competency to Stand Trial—Revised ("ECST-R") to Defendant on November 21, 2019. Wood Nov. 2019 Report 4. Dr. Wood testified that the ECST-R is designed to analyze a person's competency under the *Dusky v. United States* standard by analyzing several domains of psycho-legal questions. Hrg. Tr. 16:25-17:3.

Dr. Wood based her opinions on Defendant's performance on the ECST-R, her observations of Defendant during her nine formal visits with him during his eight-month

7 – OPINION & ORDER

commitment at FMC Butner, informal visits with Defendant bi-weekly during her rounds, conversations with the treatment facilitators that worked with Defendant, and her review of his records and phone conversations. *Id*. at 16:8-15, 18:7-11; 42:23-43:6. She summarized her conversations with other staff members about Defendant's progress as follows:

> They told me that he seemed to have a better understanding of the information. He retained the information from week to week. He was able to really be engaged in the process. And while he asked for--he asked for information to be delivered at a slower pace, the evaluators and the treatment facilitators really talked about how Mr. Collins was a stand-out participant. Actually, the word "mastery" was used in terms of his overall firm understanding, deeper than rote memorization of the material.

*Id*. at 11:14-24.

Dr. Wood testified that "on each of the three domains for . . . factual, rational, and ability to consult with his counsel, he was found to be in the normal, no impairment range" on the ECST-R. *Id*. at 18:2-6. Regarding Defendant's ability to consult with counsel, she found that he understood the role of his counsel as his advocate, knew the importance of working collaboratively with his counsel, had a positive relationship with his counsel, and understood the importance of open communication with his counsel. Defendant seemed to be motivated to work with his attorney, and she did not have any concerns that he would just defer to his attorney. *Id*. at 19:6-12; Wood Nov. 2019 Report 4. Dr. Wood testified that his mild intellectual disability did not prevent him from having a rational understanding of the proceedings:

> [W]hile he does have some limitations in his thinking . . . it's still very concrete, basic understanding, a slower process, but [] it's not impaired by any irrational thoughts about the court system or his attorney. He really seems to have a pretty basic understanding of what's expected of him and what the potential outcome of the case could be.

Hrg. Tr. 19:21-25. Defendant's factual understanding of the proceedings was the strongest, according to Dr. Wood. *Id*. at 20:5-6. She said that he knew the individuals in the courtroom, had the ability to understand the charges against him, understood his potential legal options, and

had a realistic appraisal of the criminal matter and the possibility of receiving a thirty- to eighty-month sentence. *Id.* at 19:25-20:10; Wood Nov. 2019 Report 4. He had explained his alleged role in the charges against him to Dr. Wood in July 2019 by saying, "they said I helped them get customers and I have a role, that I got people to help or hook them up with taxes." Hrg. Tr. 41:16-23.

Based on Defendant's performance on the ECST-R and the other available information, Dr. Wood opined that Defendant was competent to stand trial. *Id.* at 18:2-11.

### B. Dr. Millkey's Report and Testimony

Like Dr. Wood, Dr. Millkey reviewed Defendant's prior competency evaluations, education, and other records. Millkey Jan. 2020 Report 2. Dr. Millkey agreed with Dr. Wood's diagnosis of mild intellectual disability based on Defendant's low intellectual functioning and poor adaptive functioning. *Id.* at 23. Defendant scored in the normal range on the Test of Memory Malingering, a malingering test, and Dr. Millkey did not believe that Defendant was exaggerating or feigning his level of understanding when Dr. Millkey evaluated him. *Id.* at 15-16. To assess Defendant's competence, Dr. Millkey conducted a fitness to proceed evaluation based on the *Dusky v. United States* standard, but he did not administer a standardized test. *Id.* at 17-23. Dr. Millkey acknowledged that Dr. Wood's administration of the ECST-R to evaluate Defendant's competence was appropriate, but Dr. Millkey believed that the ECST-R was better at examining an individual's general understanding of the legal system and was not as good at evaluating an individual's understanding of the proceedings in their particular case. Hrg. Tr. 58:20-59:15. Dr. Millkey also believed that the ECST-R was better suited to analyzing the competence of someone with psychosis. *Id.* at 59:16-18.

Dr. Millkey testified that Defendant's understanding of the nature of the proceedings was reasonably good. Hrg. Tr. 61:3-10. Defendant's general knowledge about the courts, the different pleas that are available, and the important courtroom personnel were good. *Id*. Defendant was able to articulate that the government had charged him with fraud in connection with taxes and understood that the charges against him were felony charges filed in federal court. Millkey Jan. 2020 Report 17-18. Defendant also understood that a felony is more serious than a misdemeanor. *Id*. at 18.

Dr. Millkey was most concerned about Defendant's inability to name the specific charges against him. Hrg. Tr. 62:2-4. In response to Dr. Millkey's questions about what crimes the government had charged Defendant with and what his alleged role in those crimes was, Defendant responded:

> Just taxes, you know. Dealing with the taxes. Dealing with, um, the taxes . . . My baby's mom had, uh, one of them had a tax license and another had another license. So, basically it's tax . . . I know it's uh, is it fraud? I have two judges. They are saying that I did taxes . . . . They said that I did taxes, and they want me to, they said I was the person who was doing it, and I'm the mastermind. They want me to, uh, to take a deal so I can get it over with so they won't commit me to go to the uh, to the hospital.

Millkey Jan. 2020 Report 17. In response to similar questions in 2017, Defendant told Dr. Millkey:

> They accusing me of making somebody do some stuff which is not true, and making like I am the person who had some master plan where I can do the computer and do all that stuff. I'm not going to call myself stupid or dumb, but I don't know how to do that . . . . They making it seem like I am the person who is making people do stuff on the computer . . . . They said I recruit the people for it. They make how [sic] when she get caught with the stuff. She said I made her sit in the corner and do taxes.

Fitness To Proceed Eval., Aug. 4, 2017 ("Millkey Aug. 2017 Report") 13, ECF 133.

Defendant understood the role of the judge and appropriate courtroom behavior. Millkey Jan. 2020 Report 17. He understood that sometimes juries decide a defendant's guilt but stated

that a judge could overrule a jury's decision. *Id*. at 18-19. Defendant described guilty and not guilty pleas and indicated that a person who enters a guilty plea admits that they committed a crime. *Id*. at 19. He told Dr. Millkey that a person who pleads guilty does so to "get it over with" and put it behind them. *Id*. at 19. Defendant correctly identified that a person found not guilty is "done" and does not have to go back to court. *Id*.

Dr. Millkey concluded that Defendant is unable to understand the nature and consequences of the proceedings against him because, although he knew that the charges had something to do with taxes, Defendant could not name the charges against him and did not know what he was said to have done that was against the law. Hrg. Tr. 63:13-18. Dr. Millkey testified that Defendant is concerned that if he is convicted he will be committed indefinitely to FMC Butner, but he also testified that Defendant told him that he could be sentenced to thirty months. Hrg. Tr. 64:4-15.

In response to Dr. Millkey's questions about Defendant's ability to assist properly with his defense, Defendant was able to identify his lawyer, explain his lawyer's role, and knew that he should follow his lawyer's advice. Millkey Jan. 2020 Report 19-20. However, Defendant also said that he would do whatever his attorney tells him to do. *Id*. at 20. Defendant knew that he should not talk to the prosecutor without his lawyer present and knew that the prosecutor is in a position that is adverse to him. *Id*. at 20. Defendant told Dr. Millkey that the purpose of a trial was to "Talk to the judge, and let the judge know what's going on." *Id*.

Defendant stated that a person should take a plea even if they are totally innocent, just to get it over with, and told Dr. Millkey that he had learned in competency classes that accepting a plea was always the best option. Hrg. Tr. 72:2-6. When asked if he would lose any rights by accepting a plea, Defendant said that he would lose whatever rights the judge tells him he will

lose and that he would "lose" the months he is required to serve under his sentence after he accepts a plea. Millkey Jan. 2020 Report 21.

  Dr. Millkey emphasized during his testimony that he believed that the complexity of the case prevents Defendant from assisting properly in his defense. Dr. Millkey testified that a person with low intellectual functioning, in his opinion, may be fit to proceed in a trespassing case, for example, while also being unfit to proceed in a complex fraud case. Hrg. Tr. 69:13-24. Dr. Millkey testified that in order to assist properly in his defense, Defendant needs to be able to master—or at least be able to help his attorney make sense of—the complex evidence in this case. *Id*. 69:25-70:1. According to Dr. Millkey, making sense of the evidence requires the ability to do math, which is a problem for Defendant because he has the ability to do math only at a fourth-grade level. *Id*. at 70:2-15. Dr. Millkey testified that Defendant would be overwhelmed by the complexity of the evidence in his case. *Id*. at 72:8-17. Dr. Millkey also believed that Defendant's ability to confront witnesses against him would be impaired because he would need to be able "to help direct [his] attorney in addressing falsehoods or addressing weaknesses in testimony or inconsistencies . . . I don't think that Mr. Collins would be able to understand testimony against him if it is about complicated subject matter." *Id*. at 75:9-76:2.

  Dr. Millkey was concerned that Defendant would defer to his attorney instead of making his own decisions because Defendant said he would, "Um, just go ahead and go with what he has to say, because he is my attorney. My life is on his hands. I have to listen to my attorney." *Id*. at 71:7-18. Dr. Millkey testified that he thought that Defendant would do anything to avoid going back to FMC Butner. *Id*. at 55:3-4.

  Dr. Millkey testified that Defendant's competency did not seem to have improved since the last time that Dr. Millkey had evaluated him before his competency restoration treatment at

FMC Butner. Dr. Millkey was also concerned that Defendant had received misinformation during his competency restoration that, in some respects, put him in a worse position than he was in before his competency restoration treatment. *Id*. at 76:7-15. As a result, Dr. Millkey concluded that Defendant was incompetent to stand trial. *Id*. at 58:11-15. Dr. Millkey believed that there was a substantial likelihood that with additional, repetitive, competency restoration treatment, Defendant's competency could be restored. *Id*. at 76:16-22.

## STANDARD

It is a violation of due process to convict a person who is mentally incompetent to stand trial. *Pate v. Robinson*, 383 U.S. 375, 378 (1966). A person is incompetent if they suffer from a mental disease or defect that renders the person unable to understand the nature and consequences of the proceedings or unable to assist properly in their defense. 18 U.S.C. § 4241(a). Competency requires a defendant to have a "sufficient present ability to consult with [their] lawyer to a reasonable degree of rational understanding" and have "a rational as well as factual understanding of the proceedings against [them]." *Dusky v. United States*, 362 U.S. 402, 402 (1960). The *Dusky* standard applies at all stages of a proceeding. *Godinez v. Moran*, 509 U.S. 389, 399-400 (1993). Competence requires more of a defendant than passively observing trial: "[I]t requires the mental acuity to see, hear and digest the evidence, and the ability to communicate with counsel in helping prepare an effective defense." *Odle v. Woodford*, 238 F.3d 1084, 1089 (9th Cir. 2001). "The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the *ability* to understand the proceedings." *Godinez*, 509 U.S. at 401 n. 12 (emphasis in original).

The Court may rely on evidence of the defendant's irrational behavior, demeanor in court, and medical opinions to determine the defendant's competence, but no single factor is

determinative. *Drope v. Missouri*, 420 U.S. 162, 180 (1975); *Davis v. Woodford*, 384 F.3d 628, 655 (9th Cir. 2004) (citing *Torres v. Prunty*, 223 F.3d 1103, 1108-09 (9th Cir. 2000)). The government must prove the defendant's competence by a preponderance of the evidence. *United States v. Hoskie*, 950 F.2d 1388, 1392 (9th Cir. 1991) (citing *United States v. Frank*, 933 F.2d 1491, 1493 (9th Cir. 1991)).

## DISCUSSION

The Court finds by a preponderance of the evidence that Defendant has both a present sufficient ability to consult with his counsel to a reasonable degree of rational understanding and has a rational and factual understanding of the proceedings against him. Accordingly, Defendant is competent to stand trial.

### I. Present Ability to Consult with Counsel

To stand trial, Defendant must be able to participate in his defense by communicating effectively with his counsel. *Drope v. Missouri*, 420 U.S. 162, 171-72 (1975). Defendant provided similar answers to the questions posed by Dr. Wood and Dr. Millkey during their evaluations of Defendant, but the doctors reached conflicting opinions about whether Defendant's answers demonstrated a sufficient present ability to consult with counsel. Both doctors agreed that Defendant is not delusional and has not exhibited irrational behavior. They also agreed that Defendant understands who his attorney is, understands his attorney's role as an advocate for him, understands the importance of candor with his counsel, his duty to provide information to his counsel, and knows that he should cooperate with his counsel and follow his counsel's advice. Defendant correctly described to both doctors his role as a defendant, the adversarial nature of the proceedings, the role of the judge and prosecutor, and appropriate courtroom behavior.

Dr. Millkey's opinion that Defendant does not have the ability to consult with his counsel to a reasonable degree of rational understanding was based in part on Dr. Millkey's finding that Defendant did not know what his attorney would require from him in order to adequately represent him. In response to Dr. Millkey's question about what his attorney would need from him, Defendant told Dr. Millkey that he thought his former counsel left his current attorney "a lot of stuff. I think he knows, but I don't know how much he knows . . . . But whatever he tells me to do, I'm going to do it because he is smart." Millkey Jan. 2020 Report 19. Instead of demonstrating a lack of ability to consult with his counsel, Defendant's response shows that he knew that his former counsel had documents, he knew his current counsel would need those documents, and he is willing to do what his lawyer tells him to do. In explaining how he would assist his counsel, Defendant told Dr. Wood, "I tell him what's going on. He tells me what the judge said. He wants to help me. I help him. To help me win the case and to help me understand. Whatever we talk, it's private." Hrg. Tr. 39:7-13. Defendant's statements demonstrate that, at the time of both evaluations, Defendant had a sufficient present ability to consult with his counsel to a reasonable degree of rational understanding.

Dr. Wood found that Defendant was able to consider his legal options and consider his counsel's advice, but Dr. Millkey believed that Defendant would blindly follow his counsel's advice, even if he did not agree with it. During his commitment at FMC Butner, Defendant read resources in the law library to gain a better understanding of his case, received additional information about his case, and gathered information about how to learn more about his case from his counsel when he was released from FMC Butner. Hrg. Tr. 39:14-40:12. Defendant's independent reading, research, and plan to work with his counsel demonstrate to the Court that

Defendant will consider his counsel's advice, but he also has the ability to independently consider his legal options.

## II. Rational and Factual Understanding of the Proceedings

Defendant must understand the nature and object of the proceedings against him. *Drope*, 420 U.S. at 171. A rational and factual understanding of the proceedings includes the ability to make a "reasoned choice [from] among the alternatives presented." *Miles*, 108 F.3d 1109, 1112 (9th Cir. 1997).

The Court finds that Defendant has a rational and factual understanding of the proceedings. Although impaired, Defendant's level of intellectual functioning is in the higher range for people with a mild intellectual disability. Hrg. Tr. 77:6-14. Both doctors agreed that individuals with similar intellectual functioning often are competent, or may become competent, to stand trial. Defendant understood both at the time of Dr. Wood's evaluation and his later evaluation by Dr. Millkey that the government had charged him with fraud in connection with the filing of taxes. Hrg. Tr. 31:9-13; Millkey Jan. 20, 2020 Report 17. He understood that the government filed the charges against him in federal court and that they are felony charges, which are serious. He was able to explain to Dr. Wood that "[t]hey said I helped them get customers and I have a role, that I got people to help or hook them up with taxes." Hrg. Tr. 41:20-22.

Defendant understood that the government is adverse to him in the case and that he should not talk to the government's counsel without his own counsel present. He understood that he could enter a plea of guilty, not guilty, or "insanity," although he did not have a good understanding of the consequences of an insanity plea. He also understood the difference between a guilty plea and a not guilty plea. Dr. Millkey expressed concern that Defendant incorrectly answered some of Dr. Millkey's questions about guilty pleas by saying that pleading

guilty means that a person just wants to "get it over with so you don't have to be dealing with it anymore," but Defendant correctly described in response to other questions that pleading guilty is an admission of guilt, and pleading not guilty is a denial of guilt. He told both doctors that, if convicted, he faces a potential sentence of thirty or more months.[1]

The charges against Defendant allege that he is a part of a tax fraud scheme in which he solicited victims to provide their personal identifying information to third parties for the purpose of those third parties preparing the victim's tax returns. Defendant understands those allegations and his role in the scheme. Defendant has communicated several times that the government believes that he is the ringleader of the scheme and has asserted that he was not. He is capable of communicating to his lawyer when the government makes inaccurate accusations against him. He understands the possible consequences and the likelihood of each of the potential outcomes, which makes him able to make a reasoned choice from among alternatives. That level of basic understanding and ability demonstrates that Defendant has a sufficient factual understanding of the court process and the nature and consequences of the proceeding to stand trial.

Dr. Millkey's testimony that Defendant is incompetent is based in part on statements that Defendant believed to be true at the time that Dr. Millkey re-evaluated him in January 2020. For example, Dr. Millkey testified that Defendant incorrectly stated that he could be committed to FMC Butner after trial[2] and that a best-case scenario in his case would be that he takes a plea. Defendant also misunderstood who makes the final decision about his guilt. He knew that the role of the jury was to listen to both sides, but he said that the judge decides a person's guilt and

---

[1] The Court has not determined whether this statement is accurate and does not need to make that determination to decide whether Defendant is competent.
[2] It is possible that Defendant believed that he could be returned to FMC Butner based on the remote possibility that 18 U.S.C. § 4243(e) may apply to his case.

17 – OPINION & ORDER

could override a jury's decision. However, he understood those concepts when he left FMC Butner. In response to a question on the ECST-R that asked him to state the best outcome of a trial, Defendant told Dr. Wood:

> The best would be to get out of here, talk to my lawyer, figure out if I'm going to go to trial or if I could take a plea. If it was dismissed, it would be okay. I would not go to jail. I could go on with life and take care of my family.

Hrg. Tr. 35:13-18. He told Dr. Wood that the worst outcome would be that he would serve eighty months, which he believed was likely. *Id*. at 35:19-22. He also knew when he left FMC Butner that the jury decides a person's guilt. On the ECST-R, Dr. Wood asked Defendant the questions, "What does a jury do? Is a jury for or against you?" *Id*. at 26:9-25. Defendant explained that a jury is the "people who sit there and listen to you." *Id*. at 30:10-11. He also explained that a jury is neither for nor against him. Def. Hrg. Ex. 104 at 7. Based on his responses to those questions, Defendant received a score of zero, which represents no impairment, for his factual understanding of the role of the jury. *Id*.

Although Defendant may have forgotten some of the details, Defendant is able to understand the concepts. The question is whether Defendant has the ability to understand the proceedings, not whether his current recollection is entirely accurate. *Godinez*, 509 U.S. at 401 n. 12. Defendant is able to consult with his counsel, and his counsel can clarify his misconceptions. *Cf. United States v. Flores-Nava*, 21 Fed. App'x 644, 646 (9th Cir. 2001) (affirming trial court's finding of competence based on doctors' opinions that the defendant was competent even though "working with [him] might be difficult or require patience"). As a result, Defendant has a factual understanding of the proceedings against him.

Dr. Millkey's testimony that Defendant lacks a factual understanding of the proceedings because of the complexity of the discovery and evidence in the case does not alter this Court's finding that Defendant is competent to stand trial. Following Dr. Millkey's opinion, Defendant's

counsel argued that Defendant's competence to stand trial depends on the complexity of his case. The Court ordered the parties to brief that issue, and neither party identified any authority to suggest that case complexity is a factor that the Court must consider in its competency determination. The competency analysis focuses on the defendant's mental capacity, not the characteristics of the case. *Godinez*, 509 U.S. at 401 n. 12. Although it is true that the intricacies of a tax fraud case are more complex than those of a trespassing case, contrary to Dr. Millkey's assertion, Defendant does not need to be able to perform mathematical calculations or explain complicated tax returns to have a factual understanding of the proceedings or to communicate effectively with his counsel about his defense. *See United States v. Wenzel*, 497 F. Supp. 489, 491 (D. Nev. 1980) (finding the defendant competent despite his limited ability to read, write, and perform mathematics). Dr. Millkey's opinion that assisting properly in his defense will require Defendant to be able to perform math and understand tax returns fails to account for the role that Defendant's counsel will play in his defense.

Dr. Millkey was also concerned that Defendant would not be able to confront witnesses against him if they testified about complex subject matter, but Defendant is able to identify when someone says something untrue about him in court. Defendant told Dr. Wood about a time when a prosecutor lied about him when court was in session and said, "It made me feel bad. I couldn't say anything at that time. I was frustrated. I wanted to talk to my lawyer." Hrg. Tr. 36:8-13. Defendant's responses demonstrate his ability to both behave appropriately in the courtroom and assist his lawyer with confronting the witnesses against him. Likewise, Defendant's inability to name the specific charges against him does not render him incompetent. Defendant's understanding that the government alleges that he is involved in a felony tax fraud scheme by

recruiting individuals to provide their personal information so that someone else could do their taxes is sufficient.

## CONCLUSION

Defendant's understanding of the nature and consequences of the proceedings against him is obviously limited by his mild intellectual disability. Despite his disability, Defendant has the present sufficient ability to consult with his counsel to a reasonable degree of rational understanding and has a rational and factual understanding of the proceedings against him. As a result, Defendant is competent to stand trial.

IT IS SO ORDERED.

DATED: March 24, 2020.

MARCO A. HERNÁNDEZ
United States District Judge